## HILL *vs.* BURGER.

*In the matter of the Estate of* ALFRED HILL, *deceased.*

ON the final accounting of the executor, a legatee named in the will as " Elizabeth Parker," claimed to be entitled to the residue of the estate not bequeathed by the will, on the ground that she was the testator's widow. There was no allegation or proof of a ceremonial marriage ; the claimant had attended the probate of the will and interested herself in support of the will against the mother and sisters of the decedent, who were cited as the next of kin, and who contested the probate in that character ; no claim of marriage was shown until two years after the probate ;—*Held*, upon the state of the proofs as to cohabitation, reputation, and the acts and declarations of the parties, that a marriage in fact was not established.

Marriage may be inferred from the acts and declarations of the parties, and though proof of this kind is an inferior kind of testimony, yet cohabitation as husband and wife may be so open, public, and continued, as to afford evidence of the most convincing character, in favor of the existence of the contract.

Where the person claiming as a party to the alleged contract is living, and the transaction is recent, defects in the proof, or in the explanation of suspicious circumstances, are taken more adversely than when the events involved are remote, and both of the parties are deceased.

Evidence affecting the character of the claimant is competent in a matrimonial question dependent upon circumstantial proof; but where the lapse from virtue is remote, stands alone, and is followed by amendment and propriety of living, it will not deserve much attention.

To constitute a marriage, there must be an agreement *animo et facto*, to live together, as husband and wife ; and in the absence of direct proof, the contract may be inferred from circumstances ; but the degree of evidence as to cohabitation, reputation, and other facts, which will be required by the court, depends greatly upon the means existing, or fairly to be presumed to exist, for showing the actual character of the connection.

L. S. THOMAS,
J. L. JERNEGAN, *for Claimant.*

I. A marriage *per verba de præsenti*, followed by cohabitation, is valid at common law, and so recognized in this State, by a series of decisions commencing with *Fenton* vs.

*Reed,* 4 *J. R.,* (1809,) and ending with *In re Taylor,* 9 *Paige,* 611, (1842.)

The cases of *Queen* vs. *Millis,* 10 *C. & F.,* 538, and *Jewell's Lessee* vs. *Jewell,* 1 *How., S. C. R.,* 219, in which the judges were equally divided, arose upon the question, whether a marriage *per verba de præsenti,* without cohabitation, is valid.

It has been held in England, since the case of *Queen* vs. *Millis,* that a marriage *per verba de præsenti,* is sufficient for the purposes of a decree of separation. (*Catterall* vs. *Catterall,* 1 *Rob.* 580.)

II. Failure to comply with the forms or ceremonial prescribed by statute, does not affect the validity of the marriage.

III. The presumption is, that those forms are complied with; and the statement of Mrs. Hill to Wilcox of her regret that a marriage had never been formally solemnized, cannot be permitted to countervail that presumption; because as a declaration made after cohabitation ceased, it is not admissible in evidence at all; and, if at all, not as against the infant. (*In re Taylor, ut supra.*)

IV. This declaration, accompanied with the statement, that Mr. Hill had several times fixed the day for the performance of the ceremony, confirms the presumption of a marriage in fact. Such was the effect given to a similar written declaration. (*In re Taylor, ut sup.*)

V. The proof in this case is abundantly sufficient to prove a marriage.

The facts from which a marriage is to be presumed are:

1. That Hill paid his addresses to her in the early period of their acquaintance, and visited her mother and other relatives in Massachusetts, in the company of persons of unquestioned respectability and apparently with a view to marriage.

2. That soon after their return from Massachusetts, they took a house in New York, in a highly respectable neighbor-

hood, and cohabited together as husband and wife, kept house as such, and in all respects deported themselves towards each other as husband and wife for a period of six years, and until the death of Hill.

3. That soon after this cohabitation commenced, they announced themselves to Mrs. Lockwood, their neighbor, and an old acquaintance of both, as being married.

4. That during their cohabitation, they visited in families of high respectability, were received and treated by them and treated each other as husband and wife, and were universally recognized in the neighborhood as such.

5. That Hill addressed her as his wife, and as Mrs. Hill, and called her by these names, not occasionally but uniformly, not only in the presence of those who resided in the neighborhood, but of servants whom he employed or desired to employ, and of his general clerk at his store ; and never spoke of her otherwise to any one acquainted with her.

6. That Mr. and Mrs. Hill recognized Florence as their legitimate child, treated her in all respects as such, and induced their neighbors to do so ; and that Mrs. Hill brought the child often and publicly to the store.

7. The correspondence of the parties with each other during the absence of Mrs. Hill from the city and after a cohabitation of four years, and the respectfully affectionate character of that correspondence.

8. That during the entire period of this cohabitation, not a fact has been elicited tending in the remotest degree to impeach the general conduct or the fidelity of Mrs. Hill, though the attempt has been courted on our part and persevered in on theirs with unwonted zeal and assiduity throughout the entire period of a very protracted investigation.

VI. No evidence has been offered at all to rebut this presumption of marriage, even admitting that such a question is to be decided upon the mere preponderance of proof.

1. The declarations of Hill to several persons that he was not married or did not intend to get married, are entitled to

little or no weight; (1) Because none of these declarations were made to or in the presence of any person who moved in the circle which Mrs. Hill frequented, or, indeed, to any person who was acquainted with her. (2) Because none of these declarations, with the single exception of Mrs. Hyer, which I will consider separately, point to Mrs. Hill, or are a disavowal of his marriage with her, but are mere loose and general declarations. (3) Because such loose declarations have no tendency to disprove the facts of continued cohabitation and the attendant circumstances, which are established beyond dispute, and which *ex proprio vigore*, constitute a marriage.

2. The supposed concealment of his marriage from his mother and sisters.

(1.) This concealment is not sufficiently proved.

(2.) Clandestinity of itself proves nothing, unless it be shown to arise from a motive inconsistent with the existence of the marriage. Other motives, here, are not excluded. On the contrary, the evidence discloses other sufficient motive for clandestinity; the taint of negro blood in his relatives. Anxiety to conceal this fact from the circle of Mrs. Hill's acquaintances, sufficiently accounts for this supposed clandestinity. This is confirmed by the fact mentioned by Atkins, who says, that Hill " was on the sly as to his mother and sisters."

(3.) The existence of this motive accounts for all Hill's declarations, in denial of marriage. All the persons who testify to these declarations, were either acquaintances of these relatives, or moved in the same circle, except Atkins, and he knew them at least by repute.

3. The attempt to prove that Mrs. Hill was the mistress and not the wife of the deceased.

(1.) While the undisputed facts of the case remain as sworn to by our witnesses, no attempt to impeach the proper conclusion resulting from them, by this mode of indirection, can avail. In other words, if these facts are true, she cannot have been his mistress. Even had the intercourse been illicit

in its inception, the course of conduct thus proved, makes her his wife. (*Jackson ex dem. Buskirk* vs. *Claw*, 18 *J. R.*, 346; *Rose* vs. *Clark*, 8 *Paige*, 574; *Starr* vs. *Peck*, 1 *Hill*, 270.)

(2.) But, independently of this consideration, the evidence adduced to show that she ever was, at any time, his mistress, is very slight, very suspicious, and wholly insufficient.

Stephen W. Gordon is the first witness on this subject. Admitting, for argument, that the "English girl" of whom Hill spoke, was the mistress of Hill, or had been seduced by him, to authorize neither of which conclusions is there, we submit, any competent evidence, all evidence of the identity of that person with Mrs. Hill, fails. Neither her name, her residence, her description, her history, nor the sex of her child, if she had one, has been shown, or attempted to be shown.

Charles H. Atkins is the next witness on this point. Here also evidence of identity wholly fails. The person of whom this witness speaks had a name similar to Parker. It might then have been Parkin, or Parkerton, or Parkill. The evidence of identity, founded on the resemblance of a surname, the Christian name not being given, is not strong enough, we conceive, to require comment. I dismiss the question of identity by observing, that no attempt has been made to confront any of their witnesses with Mrs. Hill to prove the identity, and we call attention to it as a suspicious circumstance for the defence.

But if the identity of this person with Mrs. Hill were established, what then? Atkins says, she was reputed to be Hill's mistress. But this reputation extended no further than to the clerks in the block in which Mr. Hill's drug store was situated. Such evidence of reputation is wholly to be disregarded. Reputation can only be established by and founded on the opinions and expressions of those who reside in the neighborhood of the party, and where he is best known. (1 *Greenl. Ev.* § 461.)

Hrs. Hyer is the only witness who connects Hill's denial of his marriage with the person of my client. But her tes-

timony, we submit, is unworthy of credit. 1. Her description of the manner in which she first obtained the information of Hill's having had a child by a woman of the name of Parker, from an unknown woman in the street, is very improbable. 2. She swears that the next time she saw Hill, he voluntarily told her, that the name of the mother of the child was Elizabeth Parker; and yet, Mrs. Williams, who is called to sustain Mrs. Hyer, swears that Mrs. Hyer told her, Hill had had a child by some person, but that she, (Mrs. Hyer,) did not know the name of that person; and also swears that Mrs. Hyer spoke to her " many a time" since on the same subject, but never mentioned the name of Miss Parker. 3. Mrs. Hyer swears that she obtained a divorce from Mr. Garrett, her first husband, three months before her marriage to Mr. Hyer, and that this marriage took place in 1848 or 1849; whereas the records of the court prove, that this application for divorce was not made until April, 1854.

3. The birth of an illegitimate child to Mrs. Hill in Massachusetts.

(1.) This occurred at a period too remote to have any weight in the determination of this controversy, and when Mrs. Hill was little more than a child.

(2.) It does not appear that that fact was ever at any time known to Mr. Hill.

VII. This question is not to be decided upon the mere preponderance of proof; but, where cohabitation is proved, there is a strong legal presumption in favor of marriage, which " can be repelled only by evidence strong, distinct, satisfactory and conclusive." (*Rex* vs. *Twyning*, 2 *Barn. & Al.*,385; *Piers* vs. *Piers*, 2 *House of Lords cases* 331, 362, 380, 384.)

VIII. Delay in prosecuting this claim, until after the proceedings in relation to the probate of the will, does not prejudice our rights.

1. Delay cannot be set up against an infant.

2. Nor can such a delay prejudice Mrs. Hill. At best, as

there is no statute of limitations in question, and no estoppel, it can only operate as evidence of intention, and is easily explicable on the supposition that she was ignorant of her rights. Secondly, she made. her claim in the first proceeding to which she was a party.

IX. It is relied on by the defence, that Hill in his will designates my client as Elizabeth Parker.

The reply is:

1. This fact must be taken in connexion with the provision in the same will for Mrs. Hill and the child Florence. Men do not generally make such provisions, when the connection was merely meretricious.

2. The nature of the fact is equivocal. It may have been the effect of mental weakness in the last stages of mental disease.

3. After the acts and declarations of so many years, Hill, if living, would be precluded from denying his marriage, and the description in the will, of equivocal nature, can have, at best, no greater effect than would a similar declaration or expression made now by him, if living. (*Rose* vs. *Clark*, 8 *Paige*, 574.)

X. It is insisted, that in the complaint filed in the Supreme Court, there is no averment, that she was the wife of Hill.

1. The omission of an averment does not operate as an estoppel. (3 *Black. Com.*, 308.)

2. That complaint contains evidence that she considered herself the wife of Hill; for she is there described, and there subscribes her name as Elizabeth Hill.

XI. Neither the appearance of Mrs. Hill before the Surrogate, on the occasion of the probate of the will, her suggestions to counsel on that occasion, nor the stipulation and compromise entered into afterwards, bar her, and much less the infant, of their rights.

1. Neither Mrs. Hill nor the infant were parties to the stipulation, and they are, consequently, not bound by it.

2. Her presence in the court at the contest of the will, her suggestions to the counsel or opposition to the proceedings do not bar her of any rights. (*Acker* vs. *Ledyard*, 8 *Barb.*, 514; *Lewis* vs. *Smith*, 11 *Barb.*, 152.) Neither was she a party to those proceedings.

XII. The decision of the Supreme Court in the case of *Hill* vs. *Hill*, cannot be set up as a bar to this proceeding.

1. In that case there was no issue as to the marriage. An issue consists of an affirmation and denial. There was a denial in the answer, but no affirmation in the complaint. Consequently, the question of marriage only arose collaterally, and all that the court said on that subject was *obiter*. It follows, that the decision was no bar. (1 *Greenl. Ev. s.*, 528; *Manny* vs. *Harris*, 2 *J. R.*, 24; *Bull* vs. *Hopkins*, 7 *J. R.*, 22; *Wolfe* vs. *Washburn*, 6 *Cow.*, 261; *McGuinty* vs. *Herrick*, 5 *Wend.*, 240.)

2. If the court found on the question of marriage, such finding was unnecessary to the decision of the court in that case. But a party relying upon a fact as established by a former verdict, must show that it was absolutely necessary to the finding of that verdict; that without it the verdict could not have been rendered as it was. (*Coutant* vs. *Feaks*, 1 *Edw.*, 330; *Jones* vs. *Alston*, *Court of Appeals*, *Oct.*, 1853; *Wood* vs. *Jackson*, 8 *Wend.*, 1; *Lawrence* vs. *Hunt*, 10 *Wend.*, 80.)

3. That case remains undetermined in the General Term on appeal.

4. That decision is not set up as a bar in the pleadings, and therefore is no estoppel. (*Wood* vs. *Jackson*, *ut sup.*)

A. CHILD,
C. R. DISSOSSWAY, *for Next of Kin.*

The rule of law derived from the course of decisions in this state is, that an open public recognition, introduction, general reputation, matrimonial cohabitation, accompanied with a good character is evidence, and, unrebutted, sufficient evidence, to authorize a jury or court to infer a marriage.

1. But, presumptions may, in all cases be rebutted, always by proof in modification or explanation of the facts on which the presumption rests.

2. If the cohabitation is shown to have been meretricious in its origin, and the other circumstances are explained, the presumption does not apply.

3. Where there are facts and circumstances inconsistent with an honorable marriage relation, the presumption does not apply.

4. Presumption of a marriage in favor of a party to the marriage, and who has the means of producing positive proof, is weaker than in favor of third parties setting up rights dependent upon the marriage and unexplained : the absence of such positive proof, under some circumstance, repels the presumption altogether. (*Fenton* vs. *Reed*, 4 *John*, 52; *Jackson* vs. *Claw*, 18 *John.*, 346; *Starr* vs. *Peck*, 1 *Hill*, 270; *Rose* vs. *Clark*, 8 *Paige*, 574; *Cunningham* vs. *Cunningham*, 2 *Dow*, 482; *Matter of Taylor*, 9 *Paige*, 611; *Clayton* vs. *Wardell*, 5 *Barb.*, 215.)

I. The facts before the court are undisputed, and the facts which have transpired in the court are such as to preclude these parties from calling upon the court to presume a marriage, and preclude the court from making any such presumption or inferring any such marriage.

There is no ground for a distinction between the mother and her child.

II. The negative testimony, or what this party has not proved, is tantamount to proof of the most conclusive character and positive nature.

1. She has the means, yet gives no information where, when or how she was married. She shows no open public recognition of her as Hill's wife, but the contrary.

2. She produces nothing showing that his family ever saw her, but the contrary appears. It appears also that he was on kind terms with his mother and sisters.

III. The testimony produced by these claimants wholly fails to prove a marriage or to authorize a presumption even, if the admitted facts did not preclude a presumption.

IV. The facts proved in reply show conclusively that the connection was meretricious and not matrimonial, and that they both so regarded it,—that she was a mistress and not a wife: 1. The will itself: 2. Hill's declarations and acts: 3. The proceedings in court: 4. The acts' and declarations of Elizabeth Parker: 5. The proceedings of the executor in her behalf.

THE SURROGATE.—Upon the distribution of the testator's estate, a legatee named in his will as Elizabeth Parker, claims to be the testator's widow, and as such to be entitled to one-third of the residue not bequeathed by the will. If this claim shall prevail, the remaining two-thirds will pass to her child, Florence. Such a result will subvert entirely the design of the special decree of probate, by which this will was admitted to proof, and be in direct hostility to the testator's intention, as expressed at the time the will was prepared and executed. In the course of the protracted trial on the probate of the will, I was satisfied that the deceased had intended his mother and sisters should take his store in Greenwich street, he supposing those premises to be real estate. It appeared, however, that they were leasehold; and in consequence of this mistake, I exempted them from the decree of probate, so that they would enure to the benefit of his mother and sisters as his next of kin—there being no pretence at that time, that he had been married or had any lawful issue. This mistake as to the nature and character of his property, had such an important bearing on the decedent's testamentary intentions, that if I had been unable to render such a special decree, there would have been great doubt under the circumstances, to say the least, whether the will should not have been rejected.

Elizabeth Parker now insists that she was the lawful wife of Mr. Hill, and it becomes my duty to determine this claim. She formerly lived at Danvers and at Marblehead in the State of Massachusetts. She came to New York probably more than twenty years since, but there is no evidence as to her habits and occupation down to the year 1845, except what is afforded by a single witness, Mr. Stewart. He states that he became acquainted with her at a boarding-house in Beekman street, in 1838 or 1839, that she was in the millinery business in Pearl street, between Chatham and William, in connection with another person whom the witness subsequently married. This establishment continued some eighteen or twenty months. Mr. Stewart says that he afterwards heard she had procured a situation in a fancy store in Broadway; he mentions nothing against her character, but states that his wife never visited with her after her marriage, though she called once upon his wife. From this time there is a gap in her history until the year 1845, when she was employed at a millinery store in Park Place, but with whom, and for what period she had been there does not appear. In the summer of that year she had a store of her own in Chambers street, between West Broadway and Greenwich, and was already acquainted with Mr. Hill, the testator, who kept a drug store in Greenwich street near Barclay. She lived at her place of business, and Mr. Hill slept at his store and boarded at restaurants. In the summer of 1845, Mr. Hill accompanied her upon an excursion to Marblehead, where they stayed a few days at the house of her brother-in-law. Two persons went with them on that occasion, who subsequently intermarried with each other. After her return from Marblehead, Elizabeth Parker lived in Commerce street, some months prior to May, 1846, and then for a year in Hammersley street, and then next in the Eighth Avenue between Twenty Second and Twenty Third streets, where her child Florence was born in the month of January, 1848. From May, 1848, to May, 1849, she resided in Thirty Second street, near the Fourth Avenue; the ensuing summer and fall were

spent at Danvers; and in the spring of 1850, she began to occupy rooms in the testator's jujube factory, in Thirty Second street, near the Eighth Avenue, where she continued till his decease. There is no doubt at all that during the last four or five years of this period there was a connection between her and the testator ; but was the intercourse such as the law sanctions? No attempt has been made to prove a ceremonial marriage, and resort must, therefore, be had to such presumptions and inferences as may be fairly derived from the acts and declarations of the parties. This, in its nature, is said to be an inferior species of testimony, yet cohabitation as husband and wife may be so open, public, and continued, as to afford evidence of the most convincing character, in favor of the existence of the contract.

From 1845 to 1847, we have information as to the intercourse between the claimant and Mr. Hill, from two witnesses only—their companions on the excursion to Marblehead. One of them states that he did not know the testator before that visit, and had no acquaintance with him afterwards, except bowing to him in the street, and except also that he visited Elizabeth Parker and Mr. Hill once or twice in Commerce and Hammersley streets, where they kept house and lived together as he " supposed." He would not positively aver that he heard the testator address her as Mrs. Hill, though strongly under " the impression" he had. What weight is to be attached to this impression, after the lapse of eight or nine years, may be estimated from the fact that he testified he himself was married at this time, and was residing in Abingdon Square, where he was " strongly under the impression Mr. and Mrs. Hill visited" at his house together, when it is clear both from his own and his wife's testimony, that they were not married until December, 1847, and did not reside in Abingdon Square until after their marriage. This witness says also that they had no mutual acquaintances and he never heard them spoken of. His wife testifies that she met Elizabeth Parker in the street, after her return from Marblehead, and was informed by her that she was married.

She visited her in Commerce street, and says, "I saw Mr. Hill there; I heard him call her Mrs. Hill, at that first visit," and "understood that they were married, from what was said in presence of both. I understood them to say they were married just after their return, but I could not say how long. They did not say by whom, but if they did, I don't recollect. I don't recollect they said where or how." This witness visited Elizabeth Parker frequently up to May, 1847, when the latter having moved away, all intercourse between them ceased, until after the testator's death.

From May, 1847, to May, 1848, the proof as to the alleged marriage is limited to the evidence of John and Mary McSorley. John was then a boy of fifteen, and became acquainted with the parties when they were living in the Eighth Avenue. He says he visited there almost daily, that they were living together as man and wife, and were reputed to be such, but on further inquiry, he could not recollect hearing any of the neighbors speak of them. He says, "I can't recollect how he addressed her, or how she addressed him; I don't recollect how he spoke of the child; I cannot say that I heard him call her Mrs. Hill. When they moved, he said he wanted me to stay at the house all day to help Mrs. Hill move or pack up the things, as near as I can recollect." Mary McSorley testifies that she lived as a domestic with the parties two months in the winter of 1848. She heard from John, her cousin, "that Mrs. Hill wanted a girl." Florence was born while she was there. She states there had been a servant there before her—that Mr. Hill came home every night—that she does not remember seeing any one visit at the house, even on New Year's day—that the child was not baptized to her knowledge—that the child was sick and a physician was called in, the same who had attended at the delivery—that Mr. Hill left at six A. M., or shortly after, and returned home between eleven and twelve at night. She says "I never heard Mrs. Hill call him anything but Mr. Hill." "I always heard Mr. Hill call the lady Mrs. Hill."

But four witnesses were called in reference to the year the

parties lived in Thirty Second street, near the Fourth Avenue. At this place the child was taken sick and there were two physicians in attendance, one of whom states that he observed no difference between the parties "and other married people." Mrs. Tanner, whose husband kept a public house on the adjacent corner, was requested to come in when the child was sick. She says the testator addressed the claimant "as Mrs. Hill or the baby's ma." There were ten families residing in that row, and she states that she met some of the neighbors' wives at Mr. Hill's house, saw the claimant at several of the neighbors' houses, and walking out with some of the ladies. None of the neighbors were called to testify, except the gentleman and lady who resided immediately next door, both of whom state that the parties lived together apparently as man and wife. There was no personal intercourse whatever between the gentleman and Mr. Hill. His wife stated that she only saw Hill together with the claimant twice and that was when the child was sick—the claimant generally called him Mr. Hill—don't recollect hearing her call him husband, or speak about her marriage, or his or her family or connections, except her mother. She thought they "lived very retired," but there was nothing that led her to suspect the nature of their intercourse as improper.

In May, 1849, this establishment was broken up, and during the ensuing summer and autumn Elizabeth Parker was at Danvers, where she was remaining as late as Christmas of that year. In the spring of 1850, she began to occupy rooms at the testator's factory. Mrs. Tanner, who visited at this place, states that she was alone with the child and a domestic, and she did not see Mr. Hill there. Mr. Chandler, who was a clerk in the testator's drug store, for two years previous to March, 1850, testified that the claimant came frequently to the store—she used to bring the child there, and that Hill often asked if "his wife had been in." He says "he spoke so that any one in the store might have heard him, it was not done secretly, I have never known him to speak of his wife to any other person except myself." He also states that

Hill and the claimant used to go home together—that Hill resided near the Fourth Avenue, but did not tell him where, and he does not think any of the clerks knew where he lived. His statement that Elizabeth Parker came often to the store after she occupied rooms at the factory, shows that too much dependence may be placed upon his recollection, for he left Mr. Hill's employment, shortly after, if not about the time that the claimant began to occupy these apartments. Elizabeth Carroman, a colored woman, testified that in March, 1849, (as to which date she is undoubtedly mistaken, the other proofs indicating that it was probably in March, 1850,) she was accosted by the claimant at the corner of Thirty First street and the Seventh Avenue, and was asked if she knew any person who wanted a place. This was in the evening, the witness accompanied the claimant home to the factory, and remained until Mr. Hill came. She says, " he asked me if I would not come and live with his wife." " I was there off and on very near two months." It also appears from her testimony that Hill spent his nights there, and went away after breakfast in the morning. Peter Sawer, who worked part of a season for Hill, at the factory, states, that Hill told him he had attended his wife during her confinement. This concludes the evidence in support of the alleged marriage. Some proof was offered as to allusions made by the clergyman who officiated at the testator's funeral, in regard to his widow and orphan, and also in regard to the deportment of the claimant and the testator's mother and sisters on that occasion, but I do not consider it sufficiently definite to form the basis of any comment.

If Hill and Elizabeth Parker were married in the winter of 1845–6, their subsequent intercourse was marked by many singular circumstances, and the proof is peculiarly defective in not showing a more public recognition of the alleged marital relation. For a period of more than a year, while Elizabeth Parker was living in Commerce and Hammersley streets, her connection with Hill and its character are indicated by only two witnesses. One of these says, that he sup-

posed they lived together as man and wife, and he has a strong impression the testator called the claimant Mrs. Hill. But he never saw them together more than three or four times, was only a casual acquaintance, and, moreover, he is manifestly mistaken in several portions of his testimony. The other witness testifies that she understood from what occurred in the presence of the parties, that they had been married, but the facts from which she drew this conclusion are not particularly stated.

Again, while the parties lived in the Eighth Avenue, the proof of the relation in which they were cohabiting is limited to a servant girl and a school-boy. During that period they went once to the theatre together, and once in the day time to Harlem. No one visited at the house, not even on New Year's day, and Hill did not even communicate to his friend, Mr. Hanford Smith, who accidentally met him near his house, that he was living in that neighborhood. His residence in Thirty Second street, near the Fourth Avenue, had some tokens of publicity, but still the acquaintances who visited there were such as were formed on the spot among the neighbors. None of his clerks, unless it might be Chandler, knew where he lived, and so far as his own friends were concerned, his abode seems to have been kept a secret quite as much as before. Now in view of these circumstances it was incumbent on the claimant, seeking as she does to establish a marriage by presumption and inference, to show some degree of public recognition of the relation of husband and wife among acquaintances, beyond those casually formed in the vicinity of their residence. That kind of local reputation where the residence is brief, and has been frequently changed, is of little account standing alone, for unless the meretricious connection is to be acknowledged, a regard for appearances requires at least a tacit imposition upon a respectable neighborhood, that the parties occupy an honest relation. The character of an illicit connection is avowed only where modesty and decency are disavowed. But still it must be conceded that on the facts as thus far developed, and in the ab-

sence of a possibility of any further proof, a presumption of marriage might be founded, were there no counterbalancing testimony. But one of the parties to this alleged contract is still living, and possessed as she must be of the requisite knowledge of the facts to sustain her case, her failure to adduce further testimony is a circumstance of the most suspicious character. Where are the various owners of the premises occupied by her during her intercourse with Mr. Hill; where is the physician who attended at her confinement; where are the tradesmen with whom she dealt; she has found no difficulty in producing private papers of the testator, where are the receipts for rent of the premises in Commerce and Hammersley streets, Thirty Second street, and the Eighth Avenue; in whose name were those dwellings hired; where are her own friends, or during a period of twenty years' residence in New York, has she found none; where are her own relatives, or could they not speak to the point, although she spent several months with them after her child was born? Many of these questions she alone could answer —this cloud she alone could remove, if it were possible to dispel it. So many grave deficiencies, so many points unexplained and doubts unresolved, must shake confidence in her case, even did we look no further. As it is, these defects are silent witnesses against her. The same remark applies to the letters addressed to her by Mr. Hill during her sojourn with her relatives at Danvers, in the year 1849. So far as they go, these documents indicate interest in her welfare and that of the child Florence, and though one of them has some equivocal expressions, yet generally they contain nothing repugnant to the idea of a lawful relation. But their omissions are significant. The address is wanting in every case, so that it is impossible to say whether they were addressed to Elizabeth Parker or to Mrs. Hill; not once through all of them is the expression husband or wife employed; and only one of the answers is produced, though she has manifestly had the opportunity of producing other private papers of the testator, for the purpose of contradicting one of the

witnesses on this trial. These defects in the testimony would not be so striking, had she been surprised on this occasion by a sudden contestation, but there has been ample time for preparation, and the marriage has once before been the subject of investigation before another tribunal.

On the other hand, the testimony adduced by the testator's mother and sisters to disprove this alleged marriage will be found such as calls for more satisfactory proof of the contract than has been offered. In the first place, it is clearly shown by a deposition which there has been no effort to contradict, that over twenty years ago, Elizabeth Parker, while living at Danvers, unmarried, was delivered of a child, that she instituted a prosecution against its putative father for its support under the bastardy act, was paid about two hundred dollars in compromise of the claim, and shortly after left the child at the boarding-house of the father, during his absence. Deserting her offspring, she then came to the city of New York. This lapse from virtue is so remote in date, that her counsel strenuously urged it should not now be brought in judgment against her. Doubtless, if the claimant rested her case upon proof of a ceremonial marriage, the testimony would be incompetent. And even if there were direct evidence of a marriage *per verba de præsenti vel futuro*, though not ceremonial, these facts would have little if any weight, but where the marriage is sought to be established by inferences and presumptions, and there are opposing facts, then circumstances bearing upon the question of character are not irrelevant. Still humanity does not deny room for repentance, but rather extends the prospect of recovering from the consequences of a temporary surrender to passion ; and when the act is remote, stands alone, and is followed by amendment and propriety of living, though it may be competent as circumstantial evidence it will not deserve much attention. But the publicity of this transaction, the prosecution and settlement following it, are indications of lax and blunted perceptions, which, when found predominating at so early an age as twenty, are difficult to overcome and extirpate by en-

deavors at reformation.   Even for these, however, in the judgment of morals and of law, there is *locus penitentiæ*, but then, it is apparent that a person seeking to escape the deductions to be drawn from past misconduct, is put upon proof of good character.   This was all important to the claimant, and yet, though she has been living in New York twenty years, during which time she must have formed acquaintances, or at least have become known to many persons, not a solitary witness has she called, except those to whom she was casually and temporarily known.   Down to the birth of Florence, in 1848, but one associate of her own sex has given testimony, and this lady visited her not more than two years. While she resided in the Eighth Avenue, not a friend or acquaintance is produced who visited there, and the same remark applies to the period of her residence in Thirty Second street, if we except her immediate neighbors.   Where not only the alleged marriage, but also her previous character has been questioned, this silence seems to me very expressive. Perhaps, for the purpose of establishing merely a *primâ facie* presumption of marriage, the evidence she has offered might have been esteemed sufficient, in the first instance, but not to go further, after the proofs of the contestants had been taken, was tantamount to a confession of inability to go any further.

There certainly can be no doubt that so far as related to his mother, sisters, family, and friends, Mr. Hill held himself out as a single man.   In the first place, the residence of Elizabeth Parker was kept secret.   He, generally, when spending the night there, came home late and left early; the only occasions when his presence was conspicuous were connected with the sickness of the child, or its mother; and during the entire period of his connection, he does not appear to have betrayed her domicil to any one of his associates.   Again, those to whom he did confide the existence of his intercourse with the claimant were led by him to believe it to be of an unlawful character   I will now review the evidence of the

contestants, and see how far his conduct in this respect was uniform and consistent.

Mr. Gordon knew the testator fifteen or sixteen years, and was intimately acquainted with him. He states that he and Hill were often in company together in the evenings, and that the latter told him he " had an English girl in tow ;" that he met him in the street late at night with her, and he afterwards told him " that was the girl" he was speaking to him about; and that about two years afterwards, he said he had a child by her. He says, " he told me the time the child was born, and we had a drink over it." . . . " I can't say how many conversations we had on the subject; we had as many as forty or fifty, sometimes in the store, sometimes in the barber's shop." . . . " we were generally funning and joking about it." . . . " I did not know where this woman lived—he was very particular about that — that no body should find out, down town." . . . " I cannot say that he tried to keep the place secret, except that he did not tell me." The witness also states that Hill, after the child was born, spoke of the matter at a house of ill fame; and he adds, that he declared that he was not married to her; that " he would not marry the best woman on earth." That the witness had heard the name of Elizabeth Parker was evident, but his statements on this point were somewhat confused, and I can not be satisfied that he learned the name from Mr. Hill. Nor do I lay any stress, on the other hand, upon the circumstance that the woman of whom Hill spoke was termed " English,"— for though living at Danvers at the age of twenty, she may not have been an American, and even if she were, descriptions given of such a connection, by a man who courted secrecy, could hardly be depended upon as accurate. The question is, whether the testimony points to the claimant; and, taking in view the date, the birth of the child, and the other proofs in the case, I think that it does.

Mr. Williams was intimately acquainted with the testator, his mother, sisters, and family, for many years. He was clerk in an establishment near Hill's store, and had frequent inter-

course with him, sometimes every day. From 1846 to 1848, the witness had conversations with him at different times, and spoke to him on the subject of keeping a mistress. He states that Hill laughed and did not deny it. His language is, "sometimes he would joke about getting married—that it was time enough yet—the time hadn't come—at other times he would say he never intended to" . . . he "never pretended to me to be married—he always pretended to me to be otherwise."

Mrs. Williams testified that she had known the testator, his mother and sisters a great many years, and had often been to Mr. Hill's store. She heard from one of her friends that Hill had a child. "I often said to him, after that," she says, "Alfred, are you married, or are you going to get married? He said no, he wouldn't marry—he didn't calculate to get married. This was within a year previous to his death, I heard him pass this remark at his store." . . . "I was well acquainted in Mrs. Hill's family, often visited there. They often spoke of Alfred. I never heard he was married. I heard his mother say, she thought he never would get married as long as she lived. He was very fond of her. I often heard him speak of his mother and sisters as a son and brother ought. I never heard from any quarter that he was married."

Hanford Smith was in business some thirty years, at No. 202, Greenwich street, three or four doors from Mr. Hill's store. He deposes as follows: "I knew Alfred Hill from his commencing business there. I had dealings with him, and continued to know him to his death. I was in his store frequently; I had a mortgage on the store. I had no knowledge of Hill's having a wife. Up to the time I moved away, I frequently had intercourse with him. I moved away, May, 1847. I do not know where he boarded. I thought he slept in a room back of the store; there was a bed there. I could not swear positively, but I think he did. After I moved up town, I saw him frequently on the Eighth Avenue, near Twenty Fourth street. One night, between ten and eleven o'clock, I asked him what he was doing up there, if he was

running around after the girls up there. I asked him in a joking way; I don't think he made any answer. I saw him around there several times in the evening. I don't recollect seeing him there at all in the day time. I never heard from any quarter that he was married." Charles H. Atkyns, who succeeded Hanford Smith at No. 202, Greenwich street, in May, 1847, and previously for many years was at No. 204, Greenwich, the second door from Hill's store, testifies, " I first knew Hill when he was at Dr. Hart's, corner of Chambers street and Broadway, before he came to Greenwich street. I continued to know him till he died. About fifteen or sixteen years I think I knew him. We were very frequently in each other's stores. . . . I had knowledge somewhat of his personal habits and relations. I never knew nor heard that he had a wife. . . . He always talked to me as though he were a single man. I don't know the exact words he used, but he conveyed to me that idea. I knew a woman he was said to keep —that he had the reputation of keeping—I knew her by sight very well. I have heard of her name; I am not prepared to mention it, because I am not positive." On the name Parker being mentioned, the witness said, "I think the name was similar—it is something like the name. Hill told me he never intended to get married." . . . "He used to get his meals at restaurants, slept part of the time in his back office—I can't say where he slept the rest of the time, but I understood from him he had a house up town. He told me he would like to sell the furniture and let the house. It was somewhere above Morton street, but he kept such things pretty much to himself." As to the female whom he saw in Hill's store, " every few days," he says, " I have been in the store when she was there, and she has gone out, and the clerks, without asking, said, 'That's Hill's woman.' I have been in there when the back room door was shut, and the clerks have whispered to me she was in there, and I have gone out and seen her come out afterwards. I have seen her there at all hours, between the time of opening and shutting the store. I have been in the store when she and Hill were both present.

He never introduced her to me. . . . He would affect to make her out as though she were a customer—as if she wanted to buy something." The witness also testified that Hill's relation to this person was a matter of common repute among the clerks in the neighborhood, and that he also heard her name frequently. He adds, that Hill never told him he had a child, but in the spring before his death, spoke about marriage and what he should do if he got married.

Mrs. Downing knew Hill's family, and lived in the house, several years since, with his mother and sisters for nearly two years. She states, that within a year or eighteen months before Hill's death, she often asked him " when he was going to get married," and " he would say, not while his mother was living," and at other times, " his business was so much trouble," &c. " I never heard from any member of the family that he was married; I always supposed him to be a single man." . . . " In all my conversations with him there was no intimation that he had a wife."

Francis Grull worked at the testator's factory in Thirty Second street, the winter of 1849–50, and slept there some three months. He says, " I saw Elizabeth Parker, she came sometimes there. She said nothing, except asked for sixpence for a ride. I lent her sixpence; I told Hill about it; he said don't give her nothing at all—don't let her come in here— she has nothing to do here." Again, " she said it would be all right, and Hill would pay me when he came; she did not tell me she was his wife." Two months after, he says, " she came to the place, and wanted to look at the rooms up stairs, she wanted to come in." . . . " I told Hill the next day; I told him his lady was there; I said she was looking at the room up stairs." . . . " Hill laughed when I told him, and said, ' don't let her come in any more.' "

This is about the substance of the most important testimony in the case, relative to the acts, and declarations, and intercourse of the parties previously to Hill's last sickness. I have omitted any reference to the evidence of one of the witnesses for the contestants, though in several respects it seems in

harmony with the other proofs on that side, from a desire to consider only facts undisputed. Nor does the circumstance that Hill had a room at the Hotel, 144 Fulton street, from May 2, 1849, to April 25, 1850, appear of much consequence, for during most of that period the claimant was absent from the city, and she did not begin to occupy a room at the factory till the spring of 1850. Looking at the main features of the case, there is not exhibited any clashing of testimony, and the simple duty of the court is to say what inference is to be drawn from the facts proved. It was urged by the counsel for the claimant, that there was no direct identification of Elizabeth Parker with the person pointed out by the testimony of Gordon, Smith, and Atkyns. That is so, but with the light we now have, there can be no reasonable doubt that the person to whom they referred is the claimant in this case. There is no color for believing that another set of parties were occupying the same relation to him as this claimant and her child, and so far as the reputation in the neighborhood of his store existed, it pointed only to one person, during the period of time involved in this controversy. Grull, however, had no difficulty as to identification, for after Hill's death, he worked for Elizabeth Parker, sued her in that name for his wages, and received his money.

Now, taking all things in view together, the connection of Hill and the claimant was, at all times, more or less clandestine. Conceding that to Chandler and Sawer he used the word wife, in speaking of her, these were exceptional instances, so far as the circle of his intimates and friends was concerned. When accused by Hanford Smith of prowling around the Eighth Avenue for improper purposes, he gives no hint that he was married and had a residence close at hand. When conversing with his acquaintances on the subject of marriage he never pretended that he was married, but held himself out as a single man; by his conduct he gave occasion to his clerks and neighbors to make free with the character and reputation of the claimant; he forbade his workman Grull to let her have money, or to permit her to come into the fac-

tory; and those who were intimate in his family never heard a word of his marriage. The proof as to his lineage does not explain his behavior, for that might lead the claimant to secrecy, but it afforded no motive for his concealing the connection from his own family. Nor does it appear that the claimant had any " circle of acquaintances" to keep ignorant of the alleged marriage, unless it were her relatives in Massachusetts, and, as they have not been examined, it is dangerous to speculate about them. If Elizabeth Parker was his wife, his conduct was most extraordinary, and utterly inconsistent with the motives which usually actuate mankind. He was the instrument of having *her* treated as his mistress, whose good name, if she were his wife, even the common instincts of nature would have led him sacredly to cherish; and he was the means of stigmatizing his innocent offspring as illegitimate, when, were the fact otherwise, his behavior was alike base, unnatural, and inexplicable. An illicit connection is disgraceful, but its infamy does not equal that of the traducer and defamer of one's own wife and child. Such connections are occasionally formed, and circumstances sometimes impel the parties, for the time, to assume the appearance of a lawful relation, but the case must rarely if ever occur where a man is so lost, cold-hearted, and depraved, as to make sport of his wife and hold her out to the world as living in concubinage. It is impossible, therefore, to believe, that Mr. Hill had entered into the matrimonial contract with the claimant. Nor do I perceive anything in the actions and conduct of the claimant, after the testator's death, which shows that she considered herself to be his widow, until a long time after his decease. Mr. Hill was taken sick at Saratoga Springs, in June, 1850, and made his will at that place the same day that he died. The evidence in respect to the preparation and execution of the testator's will, its probate, and the conduct of the claimant during the course of the subsequent proceedings, is, in my judgment, entirely inconsistent with the idea that either of the parties esteemed themselves married. When it became manifest that he must

soon expire, Mr. Hill directed the preparation of his will. To his friend Le Fevre he called the claimant Elizabeth Parker: Huling, the nurse, asked him whether she "was his intended: he said no, it was a woman he had kept and had a child by." Huling asked him if the child was his and he answered, "he supposed it was:" he stated to Mr. Bockes, the counsel who prepared the will, that the child was illegitimate, and so the will was written. The probate of the will was moved by the executor, Burger; the word widow, in the usual printed form, was erased, and Hill's next of kin were stated to be his mother and sisters. The probate was resisted by the mother and sisters; the claimant was in communication with the counsel for the executor, attending the meetings before the Surrogate; the connection between her and the deceased was spoken of and treated as illicit, and not a word was heard of the pretended marriage, which, if it had been true, would have placed her interests as well as those of the child in direct hostility to the will. The will was made at the house of Mr. Wilcox, at Saratoga Springs, and after Mr. Hill's death, he was waited upon by the claimant in company with the executor. She stated that she believed it to have been Mr. Hill's intention "she and the child should have the Greenwich property—the store—that in consequence of their not having been married, she entertained some fears with regard to it . . . that Mr. Hill had set two or three different times to be married, and something had intervened to prevent it. She expressed some regret at her misfortune, that Mr. Hill had made those promises of marriage to her, but that part he had not fulfilled." "The object of her mission there, as I understood, was to find testimony to sustain the will—that is as I understood it." This witness also testified, it was his strong impression that Mr. Burger introduced the claimant to him as Miss Parker. He says, "there was no pretence either by Mr. Burger or Miss Parker, at that time, that she was married." . . . "I think she said, that although there was no marriage ceremony, Mr. Hill had always treated her and recognized her as his wife."

There is not room for doubt, then, that during the contest as to the probate of the will, the idea was never advanced that the claimant was the lawful widow of the deceased. Had she really been his wife, the parties were all standing in singularly false relations—the mother and sisters were opposing a will which it was their interest to sustain, and the claimant was acting in concert with the executor and his counsel, not only in submitting to the allegations made by the deceased as to the illicit connection, which were incorporated in the instrument, and were freely commented upon by counsel, but still more, she was actually urging a probate, which, if granted, curtailed the rights of herself and her child. When the will was admitted only as to a part of the personalty, an appeal was taken on the one side by the executor from that part of the decree which was adverse to the claimant, and on the other by the next of kin from that part which was adverse to them. By mutual consent, these appeals were abandoned in March, 1851. In October, 1851, the Supreme Court, at special term, denied a motion to set aside the orders dismissing the appeals, and, in December of the same year, the order of the special term was affirmed at the general term. In December, 1852, over two years after Hill's death, the claimant instituted a suit in the Supreme Court for the purpose of having that part of the Surrogate's decree which exempted a portion of the testator's property from the probate, declared void, and the whole will established as valid, on the ground that the Surrogate had exceeded his jurisdiction. In this proceeding, she, for the first time, styled herself Elizabeth Hill, but there was no allegation in the complaint that she was the widow of the testator; on the contrary, the effort was to reinstate the entire will as originally presented for probate, when if she and her child were the testator's widow and next of kin, their interests would have been better subserved by having the whole will rejected. Though no marriage was alleged on the face of the complaint, and no issue, therefore, was had on that point, she was allowed on the trial to adduce evidence tending to establish a

marriage, and notwithstanding opposing testimony was not introduced, the Judge decided that the marriage was not proved, and the complaint was dismissed. (*Hill* vs. *Hill*, 10 *Howard's Pr. R., p.* 264.)

This ends the history of the case, and of the efforts to disturb the testator's intentions in respect to the posthumous disposition of his property. Here we have a man on his death-bed,—within a few hours of dissolution,—in full view of the solemn responsibilities of his situation, and indeed in the very act of providing for the woman with whom he had been living, and for her child, thus showing that he was not unmindful of their claims, and of his own obligations,—and he declares the former not to be his wife, and the latter to be illegitimate, and puts upon record with his expiring breath, the words incorporated in his will, " Elizabeth Parker," and " Florence, the child of said Elizabeth."

Indeed, it is but justice to him to say, that his anxiety to consummate the execution of a will, appeared to be chiefly connected with the desire to provide for these parties ; and yet we are to believe that Elizabeth Parker was his wife and that he died with a falsehood on his lips ; an untruth, against his own wife and child, perpetrated upon the record of his will. And again we have the widow present at the probate of this will; seeking out testimony to sustain it in concert with the executor ; sitting by when the illicit nature of the connection was commented upon ; when the very proceeding itself to prove the will and the process which had been issued to the testator's mother and sisters were based upon the assumption that she was not the testator's widow; when a suggestion that she was the widow, if established, would have ousted the parties contesting the will from any standing in court ; and yet, not a word, sign or act is given, or claim asserted, repugnant to the testator's dying declarations. If it be said that she was without counsel, and was unaware of her rights, that may go to show that she was not cognizant of the effect the law might give to the evidence she could adduce of cohabitation with the testator ; but, if she only began to

believe herself the testator's widow, when advised by counsel, it is manifest she did not esteem herself his wife in his lifetime, and if so, and if Hill did not believe himself married, then it must be conceded that on both sides their cohabitation was not had in the supposition that it was marital. Doubtless parties may have rights without being aware of them, but still in a matter of marriage contract, depending upon mutual consent, belief throws light upon intention, and for this reason their acts and declarations are regarded as material elements in illustrating and determining the nature of their intercourse. The point is, was there an agreement to live together as husband and wife—was there a marriage contract *animo et facto*, with the intent to assume an honorable and lasting obligation. In the absence of direct proof, can such a contract be presumed from the conduct of the parties; was there cohabitation, reputation, and acknowledgment, public, open, and recognized; was there uniform claim of the relation of man and wife; was there reception among friends; was there no secrecy of intercourse? I am far from saying that a marriage cannot be established by presumptive evidence, except on such a combination of proofs; for by remoteness of date, death of parties, loss of evidence, or other circumstances, we are often compelled to draw the best deduction possible from very few facts, and the law is all the more charitable, when the opportunity for full explanation in such cases is not afforded. But, in the present instance, the transaction is recent, the party claiming must be privy to all the circumstances making in her favor, and must be presumed to have used them to their fullest extent. They are insufficient in view of all the proofs in the case to satisfy me, and I must therefore pronounce against the alleged marriage, with costs. With the claim of Elizabeth Parker, the interests of the child are necessarily involved, so far as the evidence which affects one is competent against the other. The most important proofs in the cause relate to the conduct and declarations of the parties during the period their intercourse continued, and though I have taken into view the sub-

sequent acts and statements of the claimant since Mr. Hill's decease, so far as they bear upon her claim, I am not prepared to say, that stripped of these circumstances, the case would have presented itself in any other view to my mind; on the contrary, stopping with the last act of the testator's life, the signature of his will, and tracing out the course of this connection from its inception down to that period, I should say there was no connubial relation established.

Costs will not be decreed against the infant. The rights of the claimant and her child must be regulated by the will, and the executor must distribute that portion of the personalty as to which the deceased died intestate, among his mother and sisters.